■ 1776 ASSOCIATES CORP., Appellant, v BROADWAY WEST 57TH STREET ASSOCIATES, Respondent.—Order and judgment (one paper), Supreme Court, New York County (Karla Moskowitz, J.), entered on September 23, 1991, affirmed, with costs, for the reasons stated by Moskowitz, J. Concur—Milonas, J. P., Asch and Smith, JJ.

Kassal and Rubin, JJ., dissent in a memorandum by Rubin, J., as follows: This appeal raises the question of whether a seller who was unable to close on a real estate transaction due to its failure to obtain a certificate of occupancy may nevertheless retain, as liquidated damages, a portion of the down payment deposited by the buyer on the ground that the buyer failed to deliver a letter of credit which, under the terms of the contract of sale, comprises the remainder of the down payment. I conclude that, under the circumstances of this case, the liquidated damages clause is unenforceable as a matter of law and that defendant-seller's declaration of defact was wrongful and operated to terminate the agreement, entitling plaintiff to the return of its down payment.

The procedure by which real estate transactions are conducted has evolved over the years, and its present form is the result of the collective experience of countless attorneys. In outline, it consists of the signing of a contract, customarily accompanied by payment of a deposit, followed by a period in which both parties prepare for closing—by clearing defects of title and arranging financing, in particular—followed by the closing on the law date, upon which each party is required to tender performance or be held in default. The present matter is complicated only because the parties chose to depart from the paradigm. In addition, while parties are otherwise free to fashion a contract to suit their needs, their latitude does not extend to rending logic or obviating common-law rules for recovery in contract.

The subject agreement dated August 24, 1989 provides in section 2.1 (a) that plaintiff purchaser shall furnish an "Initial Deposit" of $325,000 upon signing (later increased to $425,000 by a modification agreement dated October 31, 1989) to be augmented to a total down payment of $1,500,000 by a letter of credit to be delivered 70 days after signing (later modified to December 1, 1989 by the same modification agreement). Section 2.1 (b) of the contract, as modified by the October 31, 1989 agreement, provides that if the purchaser fails to deliver the letter of credit by December 1, 1989, defendant seller is entitled to retain the initial deposit as liquidated damages (except under certain conditions which have not arisen). Sig-

nificantly, the October 31 modification agreement also provides that defendant shall deliver to plaintiff a copy of an amended and corrected certificate of occupancy, reflecting the actual use of the second floor and penthouse, "at least forty-five (45) days prior to Closing". The contract sets the closing date as January 15, 1990, and 45 days prior to that date is the same December 1, 1989 (General Construction Law § 20).

Plaintiff in its moving papers contends, and defendant does not deny, that in late November 1989 it was learned that defendant could not obtain the necessary certificate of occupancy. The affidavit of defendant's own agent confirms that no application for a certificate of occupancy was filed with the New York City Buildings Department until January 16, 1990, and that application was only for a *temporary* certificate. Further, the same affidavit, dated October 9, 1990, is devoid of any assertion that a permanent certificate of occupancy had been issued even at that late date. Finally, defendant neither asserts nor presents any evidence that the title company would have been willing to accept a temporary certificate "and insure at regular rates" in accordance with section 3.5 of the contract.

This matter raises some elemental issues with respect to the law applicable to the recovery of liquidated damages. Where a buyer wrongfully refuses to close title under a contract for the sale of real property, "[s]eller's damages are measured by the difference between the purchase price and the market value of the property" (Friedman, Contracts and Conveyances of Real Property § 12.1 [A], at 504 [2d ed 1963]). As an alternative, the seller may retain the buyer's down payment as liquidated damages. However, the rules surrounding the recovery of liquidated damages have their origin in equity and, indeed, some decisions speak of an action for liquidated damages and an action at law in the alternative *(see, e.g., Mosler Safe Co. v Maiden Lane Safe Deposit Co.,* 199 NY 479, 486). The practical consequence of this equitable lineage is that the courts will scrutinize provisions for liquidated damages more closely than general contract terms. Equity denies enforcement of a penalty provision on the ground that this is a prerogative of the State and not the parties to a contract. The injury for which liquidated damages are specified must be difficult or impossible to calculate, the sum stipulated must bear a reasonable relationship to the damages actually incurred and, of course, the parties must intend to provide for an assessment of damages rather than the imposition of a penalty (Calamari and Perillo, Contracts § 232, at 366-368).

The general rule is that a purchaser may not recover any part payment made on account of an agreement to purchase real property "from a seller willing and able to convey" (Friedman, Contracts and Conveyances of Real Property § 12.1 [C], at 507, *op. cit.*). A vendor may not consider a vendee to be in default without having made a tender of performance. The authority cited in the leading case of *Lawrence v Miller* (86 NY 131, 137) requires that "there must be averment or proof of a tender of conveyance, or of a readiness or willingness to convey * * * or that there must be performance, or something equivalent to performance". As more recently stated, retention of the down payment by the vendor was upheld in *Lawrence v Miller (supra)* because it was established that "the vendor acquired the money rightfully, failed in no duty to the vendee, and the money would have been his *but for* the vendee's breach" *(Maxton Bldrs. v Lo Galbo,* 68 NY2d 373, 379 [emphasis added]).

It is therefore well settled that a prospective purchaser may not recover his down payment where he wrongfully fails to go to closing *(Maxton Bldrs. v Lo Galbo, supra; Lawrence v Miller, supra).* The theory advanced by defendant herein in support of its refusal to return plaintiff's down payment is not founded upon plaintiff's failure to close, however, but merely upon its failure to provide a letter of credit, upon which "defendant informed plaintiff that it was in default of its obligations under the Agreement and that the Agreement was, therefore, terminated and of no further force and effect. Further defendant notified plaintiff that it would retain the Initial Deposit as liquidated damages."

The contract provision relied upon by defendant predicates the right to retention of the initial deposit of $425,000 not on plaintiff buyer's failure or refusal to close title but upon its mere refusal to pay a sum of money. "Generally, parties to the sale of real property, like signatories of any agreement, are free to tailor their contract to meet their particular needs and to include or exclude those provisions which they choose" *(Grace v Nappa,* 46 NY2d 560, 565). This freedom, however, does not embrace an abridgement of common law by negating elements of a cause of action. Nor does it require the courts to ignore the realities of the legal situation of the parties in favor of a slavish adherence to the language they have chosen to employ in a contract. The subject provision purports to dispense with any obligation on the part of defendant seller to make a tender of performance at a closing in contravention of the rule set down in *Lawrence v Miller (supra).* While a seller

may retain, as liquidated damages, amounts paid on account of a contract of sale upon the buyer's default, as a matter of law, no default is established unless the seller makes a tender of performance at a closing and the buyer wrongfully refuses to consummate the transaction *(see, Smith v Putnam,* 145 AD2d 383, *lv denied sub nom. Dorfman v Putnam,* 74 NY2d 758; *see also, 32 Beechwood Corp. v Fisher,* 19 NY2d 1008) or the buyer prevents the closing from taking place *(Big Z Car Wash Corp. v Joutar Intl.,* 149 AD2d 392, *lv denied* 74 NY2d 608 [buyer's bad faith refusal to negotiate renders impossible fulfillment of condition precedent to closing]). As the Court of Appeals stated the general principle, "When a provision that time is to be of the essence is inserted in a real property contract, the date established as the law day takes on especial significance. Ordinarily, the law will allow the vendor and vendee a reasonable time to perform their respective obligations, regardless of whether they specify a particular date for the closing of title * * * When there is a declaration that time is of the essence, however, each party must tender performance on law day unless the time for performance is extended by mutual agreement" *(Grace v Nappa,* 46 NY2d, *supra,* at 565).

The matter at bar illustrates the wisdom behind this rule. Plaintiff, in its brief, advances the argument that defendant could not deliver the required certificate of occupancy, thereby relieving plaintiff of any further obligation under the contract. Indeed, the record on appeal is far from sufficient to establish that defendant, either at the time set for closing or at any reasonable time thereafter, was able to convey clear title to the property in accordance with the terms of the contract of sale. But had defendant simply scheduled a closing whenever it was ready to tender performance, there would be no question with regard to its ability to convey a clear title pursuant to the terms of the contract. Pursuant to section 3.5 thereof, the determination of the title company would have been dispositive of this issue. Moreover, in the absence of a closing, it cannot be said as a matter of law that defendant was ready to perform its obligations under the agreement nor that it would have been entitled to payment of the purchase price *but for* plaintiff's asserted default *(Maxton Bldrs. v Lo Galbo,* 68 NY2d, *supra,* at 379).

The failure to schedule a closing takes on added significance because plaintiff's failure to deliver the letter of credit is unaccompanied by any indication that, in so doing, it intended to repudiate the contract by failing to close title. The breach

of an agreement, including neglect in making a payment, is not tantamount to a refusal to perform or abandonment (*Carver v Apple Rubber Prods. Corp.*, 163 AD2d 849; *Staebell v Bennie*, 83 AD2d 765). Defendant's unilateral declaration of a breach and termination of the contract is founded entirely upon section 2.1 (b) which provides that, upon failure to deliver the letter of credit, "this Agreement shall be terminated and of no further force and effect and, in such event, Seller shall be entitled to retain the Initial Deposit as liquidated damages". There is no contention by defendant that plaintiff is not creditworthy, or that the lack of a letter of credit impeded defendant's performance or that it was for any reason prevented from scheduling a closing. Its entire right to retain the $425,000 "Initial Deposit" is derived from plaintiff's failure to turn over a letter of credit for $1,025,000 on December 1, 1989, that is, upon plaintiff's failure to pay a sum of money on time.

In the absence of a closing, defendant can only speculate that plaintiff would have breached the contract and failed to tender the full balance of the purchase price of $30 million on whatever date was ultimately designated as the law day. Moreover, it is only the failure to schedule a closing which creates any uncertainty as to the damages incurred by plaintiff's failure to pay the $1,025,000 on time. "In general, the damages collectible for failure to pay a sum of money are limited to interest at the legal rate, if any exists, or at market rates" (5 Corbin, Contracts § 1065, at 373-374). Defendant's damages are simply the interest on $1,025,000 for the period from December 1, 1989 to the date of closing. Furthermore, where, as here, damages can be precisely determined, a liquidated damages clause is unnecessary. Finally, where the damages specified are out of all proportion to the loss actually sustained, the clause is void as a penalty. As this court stated in *X.L.O. Concrete Corp. v Brady & Co.* (104 AD2d 181, 183, affd 66 NY2d 970), "when the damages flowing from the breach of a contract are easily ascertainable, or the damages fixed are plainly disproportionate to the injury, the stipulated sum will be treated as a penalty". A provision for forfeiture of $425,000 as the result of the failure to pay $1,025,000 45 days before it would otherwise be due under the terms of the agreement (75 days if plaintiff exercised its right to adjourn the closing under section 8 of the agreement or any other interval, determined by any reasonable period by which defendant adjourned the closing, at its option) is grossly disproportionate to any loss of interest which might be incurred by defendant and void as a penalty.

Defendant contends that its failure to deliver to plaintiff a copy of a corrected and amended certificate of occupancy has no bearing on plaintiff's obligation to provide a letter of credit because plaintiff's performance of its obligation was made "time * * * of the essence" and its own performance was not. Under the circumstances of this case, if not as a general proposition, this argument is specious. As noted above, the amendment agreement of October 31, 1989 provides that the date by which defendant is required to furnish a copy of a corrected and amended certificate of occupancy is identical to the date plaintiff is required to supply the letter of credit. By implication, these clauses are mutually dependent. As one authority states the general rule, "Where the promised acts are capable of simultaneous performance, each duty of performance is constructively conditioned upon conditional tender of the other" (Calamari and Perillo, Contracts § 156, at 244). Defendant's contention that its obligation to supply a corrected certificate of occupancy is entirely independent from plaintiff's obligation to furnish the letter of credit is clearly at variance with this doctrine. Moreover, defendant does not dispute that it was plaintiff's concern that defendant would be unable to obtain an acceptable certificate of occupancy which prompted the inclusion, in both the contract of sale and the modification agreement, of the requirement that defendant supply plaintiff with a copy of the amended and corrected certificate at least 45 days prior to closing. As defendant points out in its brief, "The Modification dealt with only two subjects—the L/C [letter of credit] and the C/O [certificate of occupancy]." Therefore, both the particular circumstances of this case and the general rule of construction suggest that the intent of the parties in entering into the modification agreement was to make "the performances * * * concurrent at least in the sense that one need not proceed with his performance unless the other performance is proceeding apace" (Calamari and Perillo, Contracts § 156, at 245).

In a footnote in its brief, defendant acknowledges, "Obtaining a permanent C/O required compliance with Local Law 5, a potentially time consuming procedure." Yet defendant, although aware of the necessity to obtain an amended certificate of occupancy before going to contract on August 24, 1989, waited until October 17 to employ someone to work on this task. Defendant's conceded failure to retain counsel to procure an amended certificate of occupancy until some two months after the contract was signed and the failure to apply for a temporary certificate until January 16, 1990, the day follow-

ing the closing date set forth in the contract, demonstrate that defendant's performance was not "proceeding apace" and that plaintiff's obligation to perform the concurrent condition of delivering the letter of credit simply never arose.

The subject contract provision is anomalous in that it purports to make the time of closing of the essence *only as to plaintiff's performance.* The parties either agree that time is of the essence or they do not. The rule of equity, generally applied in real estate transactions, is that "time of performance will not be considered of the essence of the contract unless it affirmatively appears that the parties regarded it as a material consideration" *(Lusker v Tannen,* 90 AD2d 118, 124). Defendant's adherence to the time of the essence provision is, according to its construction of the terms of the contract, entirely at its option, raising at least a question of how material timely performance was to defendant at the time of contract, if not a more fundamental issue of mutuality of obligation. But, even assuming the validity of the contract provision, defendant's cavalier indifference to the contractual requirement that it obtain an amended certificate of occupancy as a prerequisite to closing and its admitted failure to comply with this provision so that a closing could be scheduled 45 days later demonstrate its waiver of any time of the essence requirement which might have been in effect under the terms of the contract of sale *(see, GDJS Corp. v 917 Props.,* 99 AD2d 998; *Lusker v Tannen, supra,* at 124).

The gravamen of defendant's position is that, irrespective of its own unwillingness or inability to convey title, plaintiff should be held to be in default and made to forfeit, as liquidated damages, its initial deposit of $425,000. In the words of a court confronted with a similar argument, I "find no merit to defendants' other contentions that plaintiff was required to tender performance. A purchaser is not required to make a tender when it is apparent that the seller cannot or will not perform" *(Rhodes v Astro-Pac, Inc.,* 51 AD2d 656, 657, *affd* 41 NY2d 919).

In the absence of a demonstrable right to retain the down payment, defendant was not justified in declaring plaintiff in default of its obligations under the contract. The vendor's wrongful declaration of forfeiture may amount to an abandonment equivalent to mutual rescission, upon which the purchaser is entitled to recover any payments made *(Levine v Sarbello,* 112 AD2d 197, 200, *affd* 67 NY2d 780). Defendant's letter of December 4, 1989, declaring the agreement "terminated and of no further force and effect", clearly denotes

abandonment. Therefore, defendant's wrongful declaration of a default and termination of the agreement had the opposite of its intended effect, vesting the right to the deposit in plaintiff.

Under the circumstances, defendant's bald contention that plaintiff is in default for failure to tender funds to which defendant has established no right is uncompelling. In relying upon a literal application of the terms of the contractual forfeiture provision to summarily grant judgment in defendant's favor, Supreme Court overlooked the well established rule that the parties' "declaration, in the event anticipated, that the sum fixed is a liquidation of the damages, or a penalty, is not conclusive and its interpretation is for the court; having regard to the nature of the contract and the circumstances. It may be observed, generally, that whenever the damages flowing from the breach of a contract can be easily established, or the damages fixed are, plainly, disproportionate to the injury, the stipulated sum will be treated as a penalty" *(Mosler Safe Co. v Maiden Lane Safe Deposit Co.,* 199 NY, *supra,* at 485).

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Karla Moskowitz, J.), entered September 23, 1991 which, *inter alia,* granted defendant's motion for summary judgment dismissing the complaint, and which denied plaintiff's cross-motion for summary judgment, should be reversed, on the law and the facts, the motion denied and the cross-motion granted, without costs.